**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF WEST VIRGINIA**
**IN CHARLESTON**

| | |
|---|---|
| IN RE: | CASE NO. 2:15-20637 |
| MICHAEL ALLEN TUDOR, | CHAPTER 13 |
| Debtor. | JUDGE FRANK W. VOLK |

## ORDER VALUING 2007 FLEETWOOD DOUBLEWIDE MOBILE HOME, LOCATED AT 366 WEALTHY ACRES ROAD, DRYBRANCH, WV 25601

This matter came before the Court on Confirmation of Debtors' Chapter 13 Plan (Doc. 4) (the "Plan") and the objection thereto by Vanderbilt Mortgage and Finance, Inc. (Doc. 27) (the "Objection"). Within the Plan was a Motion to Value Secured Property (the "Motion to Value"). The Court held a hearing on the Plan and Motion to Value on June 22, 2016, during which testimony and exhibits were presented by both parties in interest. At the conclusion of the hearing, the Court took the matter under advisement.

Based on consideration of the pleadings, the evidence admitted at the hearing, and the arguments of counsel, the Court makes its findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52, as made applicable by Fed. R. Bankr. P. 7052.

**I.**

The Court's findings of fact, all by a preponderance of the admitted evidence, are as follows:

The Debtor, Michael Allen Tudor, became indebted to Freedom Homes on or about May 4, 2009. Freedom Homes then assigned its rights to Vanderbilt Mortgage and Finance, Inc. ("Vanderbilt"). The indebtedness arose from a Manufactured Home Promissory Note, Retail

Installment Contract-Security Agreement (the "Loan"). The indebtedness was secured by placing a lien on the Certificate of Title of a new 2007 Doublewide Fleetwood Crown Point Xtreme, Serial No. VAFL719A/B63760-PX13 (the "Manufactured Home"). The original principal amount of the indebtedness was $83,873.48. The repayment terms were as follows: 240 monthly payments of $856.02.

Mr. Tudor defaulted on the Loan in August of 2015 and his outstanding indebtedness currently stands at $71,034.19. Mr. Tudor filed a Chapter 13 petition on December 15, 2015. Mr. Tudor simultaneously filed a Chapter 13 plan which purported to value the Manufactured Home at $10,000.00, and provided for payment of $10,609.53 to Vanderbilt over the life of the plan. Vanderbilt filed a Proof of Claim on January 19, 2016, listing the secured indebtedness as $70,035.38 and arrearages of $4,984.22. Attached to that proof of claim were the Loan documents and the pertinent Certificate of Title. Vanderbilt objected to the Plan on January 11, 2016, asserting that the value of the Manufactured Home was significantly more than what Mr. Tudor estimated.

The Court held an evidentiary hearing on the Plan and the Objection on June 22, 2016. Vanderbilt tendered its appraisal as Exhibit 1 ("Vanderbilt's Appraisal"), provided colored photographs of the property as Exhibit 2, and adduced the testimony of its appraiser, Walter Banks. Tudor's counsel tendered his appraisal as Debtor's Exhibit 1 ("Debtor's Appraisal"), along with colored photographs of the property in a Photograph Addendum. Counsel additionally called the Debtor's appraiser, Eddie Estep. Mr. Tudor also testified about the condition of the Manufactured Home.

Vanderbilt's Appraisal valued the Manufactured Home at $50,100. Debtor's Appraisal valued the Manufactured Home at $24,850. Mr. Tudor valued the Manufactured Home at $10,000.

## II.

### A. Governing Standard

This is a core proceeding pursuant to 28 U.S.C. § 157, as the matter arises under 11 U.S.C. §§ 506(a) and 1325(a)(5)(B). The Court is vested with subject jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334.

In the Plan, the Debtor is attempting to use the "cram down" provision of § 1325(a)(5)(B). In order for the Debtor to do so,

> (ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim; and
>
> (iii) if –
>
> > (I) property to be distributed pursuant to this subsection is in the form of periodic payments, such payments shall be in equal monthly amounts; and
> >
> > (II) the holder of such claim is secured by personal property, the amount of such payments shall not be less than an amount sufficient to provide to the holder of such claim adequate protection during the period of the plan . . .

11 U.S.C. §§ 1325(a)(5)(B)(ii)–(iii). The question of "value" is addressed by 11 U.S.C. § 506(a), which states pertinently that:

> (1) An allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such

3

> property . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.
>
> (2) If the Debtor is an individual in a case under chapter 7 or 13, such value with respect to personal property securing an allowed claim shall be determined based on the replacement value of such property as of the date of the filing of the petition without deduction for costs of sale or marketing. With respect to property acquired for personal, family, or household purposes, replacement value shall mean the price a retail merchant would charge for property of that kind considering the age and condition of the property at the time value is determined.

11 U.S.C. §§ 506(a)(1)-(2) (2012). Prior to the passage of BAPCPA, the term "replacement value," undefined in the Bankruptcy Code, was interpreted by the Supreme Court in *Associates Commercial Corp. v. Rash*, 520 U.S. 953 (1997). Replacement value was "the price a willing buyer in the debtor's trade, business, or situation would pay to obtain like property from a willing seller." *Id.* at 960. So, when a debtor attempted to "cram down" a secured creditor under § 1325(a)(5)(B), "the value of property retained . . . is the cost the debtor would incur to obtain a like asset for the same proposed . . . use." *Id.* at 965.

Following enactment of § 506(a)(2) in 2005, bankruptcy courts struggled with calculation of "retail value," or the value a retail merchant would charge for the collateral. In the quest to assign a number to that value in any case, a Court must hear and evaluate testimony in accordance with the qualification and credibility of expert witnesses. *In re Prewitt*, No. 15-60222, 2015 Bankr. LEXIS 4124, at *15 (Bankr. E.D. Tex. Dec. 8, 2015) (citing *In re Wright*, 460 B.R. 581, 584 (Bankr. E.D.N.Y. 2011); *In re Grind Coffee & Nosh, LLC*, 2011 Bankr. LEXIS 1335, at *6 (Bankr. S.D. Miss. Apr. 4, 2011)). Oftentimes, multiple appraisers provide conflicting valuations, and "[w]hen two appraisal reports conflict, a court must determine the value based on

4

the credibility of the appraisers, the logic of their analys[es] and the persuasiveness of their subjective reasoning." *In re 3G Props., LLC*, No. 10-04763-8-JRL, 2011 Bankr. LEXIS 4634, at * 20-21 (Bankr. E.D.N.C. July 12, 2011) (quoting *In re Sailboat Props., LLC*, No. 10-03718-8-SWH, 2011 Bankr. LEXIS 1316, at *17 (E.D.N.C. Mar. 31, 2011)).

Several factors have emerged to assist courts in weighing conflicting appraisal testimony. Those factors include: the appraiser's education, training, experience, familiarity with the subject of the appraisal, manner of conducting the appraisal, testimony on direct examination, testimony on cross-examination, and overall ability to substantiate the basis for the valuation presented. *Prewitt*, at *15 (quoting *Anderson v. Mega Lift Sys., LLC (In re Mega Systems, LLC)*, 2007 Bankr. LEXIS 1957, at *8 (Bankr. E.D. Tex., June 4, 2007)); *In re Smith*, 267 B.R. 568, 573-73 (Bankr. S.D. Ohio 2001). A court need not, however, fully credit one appraiser over another. Instead, the Court may permissibly arrive at its own valuation conclusion based on its own interpretation of the evidence. *In re Breakwater Shores Partners, L.P.*, No. 10-61254, 2012 Bankr. LEXIS 1454, at *33 (Bankr. E.D. Tex. Apr. 5, 2012) (citing *In re Holcomb Health Care Servs., LLC*, 329 B.R. 622, 669 (Bankr. M.D. Tenn. 2004)); *see generally Sailboat Props.*, 2011 Bankr. LEXIS 1316. Additionally, if valuation testimony is provided by a property owner, that testimony is admissible, "but to sway the Court it must be persuasive." *In re Tucker*, No. 12-05872-HB, 2013 Bankr. LEXIS 1777, at * 9 (Bankr. D.S.C. Jan. 25, 2013).

**B. Analysis**

Mr. Tudor's appraiser, Mr. Estep, based his valuation on the cost approach method, relying mainly on the National Automobile Dealers Association ("NADA") database. The cost approach method is an appraisal technique whereby a fair valuation for property is calculated by

establishing a "replacement value" for the property using a NADA report, and then adjusting the valuation according to the manufactured home's age, location, condition, and components found inside. *In re Jude,* No. 15-10330, 2016 Bankr. LEXIS 2387 (Bankr. E.D. Ky. June 24, 2016). The cost approach method is well accepted as a means to value mobile homes in this state. *Lee Trace LLC v. Raynes*, 751 S.E.2d 703 (W. Va. 2013).

The Court finds Mr. Estep to be a qualified appraiser. He is a licensed and certified residential real estate appraiser, with a number of years of experience. Mr. Estep estimated that he has appraised as many as 400 mobile homes and associated personal property in West Virginia. Mr. Estep also described how he arrived at the value of $24,850.  Mr. Estep personally inspected the Manufactured Home, and found it to be of "fair" quality. He additionally detailed some of the extensive damage that he found in the Manufactured Home, including impaired countertops in the kitchen, damage to the carpet, a wall in the kitchen being "out of plumb,"[1] as well as water damage in the bathroom. These concerns influenced Mr. Estep to conclude that the Manufactured Home was constructed from cheap materials, qualifying it for categorization under "fair condition." The Court notes that during cross examination Mr. Estep admitted that he did not input the Manufactured Home's specific tradename in the NADA database worksheet.

As a lay witness, Mr. Tudor testified to extensive damage suffered by the Manufactured Home.  He noted that he had encountered problems with the roof joint, the windows, and the kitchen.  Mr. Tudor testified that he paid $78,000 for the Manufactured Home.  Mr. Tudor also testified that he added several pieces of personal property to the Manufactured Home. He

---

[1] *See* Meriam-Webster Dictionary, *available at* www.meriam-webster.com (search "out of plumb") (last visited July 14, 2016) ("not straight upright."); Oxford Dictionaries, *available t* www.oxforddictionaries.com (search "out of plumb") (last visited July 14, 2016) ("Not exactly vertical").

6

believes the value of the Manufactured Home is $10,000. The Court finds persuasive Mr. Tudor's testimony regarding the extensive damage to the Manufactured Home.

Vanderbilt's appraiser, Mr. Banks, is also deemed qualified. Mr. Banks is the owner of a company which provides appraisal services for manufactured homes throughout the country. He has been certified as an appraiser for approximately 40 years. It was estimated that Mr. Banks has testified several dozen times in bankruptcy cases around the country. He based his work on the cost approach method as well. For the Creditor's Appraisal, Mr. Banks (1) first established a "replacement value" for the property using both the NADA database and a Nationwide Appraisal Services ("NAS") worksheet, and (2) then adjusted the valuation according to this specific Manufactured Home's age, location, condition, and components found inside the mobile home. *In re Jude,* No. 15-10330, at *6 (Bankr. E.D. Ky. June 24, 2016).

Mr. Banks personally inspected the Manufactured Home in order to ascertain its condition. He concluded that the Manufactured Home was of good workmanship, in good condition, and included some additional appliances that were not part of the base model. Mr. Banks used the NAS worksheet to arrive at a valuation of $50,100. On cross examination, however, Mr. Banks admitted that he did not account for the fact that some of the appliances in the manufactured home were the personal property of Mr. Tudor. Mr. Banks also noted that he found no indication any walls were out of plumb. Lastly, Mr. Banks testified that if he were in the market for a mobile home, that he would pay $50,000 for this particular model. In the Court's estimation, that observation diminished Mr. Banks' credibility.

A review of the exhibits and the testimony leads to a finding that the Manufactured Home is properly valued at $32,500. When using the cost approach method to determine the value of mobile homes, the appraisal price should be adjusted to account for such factors as Mr. Tudor's

personal property being present therein, along with certain structural problems that were evident in the Manufactured Home.

Accordingly, by a preponderance of the evidence, this Court finds the value of the Manufactured Home to be $32,500.



Frank W. Volk, Chief Judge
United States Bankruptcy Court
Southern District of West Virginia